37 F.3d 1498
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 BOARD OF COUNTY COMMISSIONERS, HOLMES COUNTY, OHIO,
Plaintiff-Appellant,
v.
INTERNATIONAL SURPLUS LINES INSURANCE COMPANY & Twin City
Fire Insurance Company, Defendants-Appellees.
 No. 93-3417.
 United States Court of Appeals, Sixth Circuit.
 Oct. 3, 1994.
 
 Before: WELLFORD, BOGGS and SILER, Circuit Judges.
 PER CURIAM.
 
 
 1
 The Board of County Commissioners of Holmes County, Ohio brought this action in district court, pursuant to diversity jurisdiction, 28 U.S.C. Sec. 1332, against two of its insurers. The Board claimed bad faith refusal of coverage and breach of contract after the insurers denied policy coverage and refused to defend or indemnify the Board for costs it incurred in settling a sexual harassment suit, brought against the county sheriff and the Board by a clerk in the sheriff's department. The district court, applying Ohio law, granted summary judgment to both insurers, and this timely appeal followed. For the reasons set forth below, we affirm.
 
 
 2
 * On January 27, 1989, Ms. Jamie Proper, a records clerk in the Holmes County Sheriff's Department, filed a charge of sexual harassment with the Equal Employment Opportunity Commission (EEOC) and the Ohio Civil Rights Commission (OCRC), claiming that she had been subjected to four years of unwanted sexual advances and retaliatory discrimination by then-Sheriff Croskey. Ms. Proper reached a quietly negotiated "conciliation agreement" with the sheriff and his department on October 30, 1989. In that agreement, the sheriff agreed to cease all discriminatory activity against Proper and to award her back pay to compensate for retaliatory employment assignments that had been imposed after she spurned his advances. The negotiations were conducted discreetly, and the only persons who knew about the complaints and their tentative resolution were Croskey, Ms. Proper, her then-husband, and the commission members involved in bringing them together.
 
 
 3
 Unfortunately, the atmosphere was shattered soon after, when reporters from The Holmes County Hub, the local newspaper, learned about the private conciliation agreement and asked Ms. Proper for an interview. On January 18, 1990, the paper published an article that revealed the agreement and included excerpts from the interview with Ms. Proper. That public exposure apparently shattered the "conciliation agreement." Six weeks later, Ms. Proper filed a second complaint with EEOC and OCRC, charging renewed harassment and retaliatory employment discrimination. Renewed conciliation talks continued through the summer but ultimately broke down. On October 22, 1990, Ms. Proper and her then-husband filed suit in federal district court. Their action named Croskey, the Holmes County Sheriff's Department, and the County Board of Commissioners ("the Board") as defendants, and it asserted a wide range of federal and pendant state law claims.[1] As damages, the Propers sought compensation for emotional and physical distress resulting in medical expenses and lost wages; back pay; lost future wages resulting from "impairment of activity," a psychological disability; pain and suffering; punitive damages; and attorneys fees.
 
 
 4
 Meanwhile, in a series of apparently unrelated developments, the Board entered into a one-year "Public Officials and Employees Liability Insurance" contract ("PO & E policy") with International Surplus Lines Insurance Co. ("ISLIC"), beginning October 1, 1989. Eleven months later, on August 6, 1990, the Board applied to renew the contract for another year. County Commissioner Bell signed the renewal application "acting on behalf of ... the applicant and all persons ... seeking insurance." In the application, Bell indicated that, as far as he knew, no county employees had made claims of "unfair or improper treatment" on the job; no claims had been made against any county officials or employees; no information then available indicated circumstances that might give rise to such claims in the interim; and he agreed that such claims would be excluded from coverage if any county official or employee did know of any "fact, circumstance or situation indicating the probability of a claim."[2] The Policy Proposal that Bell signed stated, in pertinent part:
 
 
 5
 No fact, circumstance or situation indicating the probability of a claim or action is now known to any Public Official or Employee; and it is agreed by all concerned that if there be knowledge of any such fact, circumstance, or situation, any claim or action subsequently emanating therefrom shall be excluded from coverage under the insurance here being applied for.
 
 
 6
 Under the terms of the ISLIC PO & E policy, the insurer is not obligated to defend its insured, but it must indemnify all covered legal claims, subject to a $1,000,000 liability limit and a $5,000 deductible. The policy carries certain exclusions. For example, "Exclusion 5(a)" denies coverage for legal-defense costs and other damages "arising from, or caused by, bodily injury, personal injury, sickness, disease or death."[3]
 
 
 7
 The Board also entered into a one-year Comprehensive General Liability Insurance contract ("CGL policy") with Twin City Fire Insurance Co. ("Twin City"), beginning October 30, 1989, and it renewed that policy for another year, too. The policy limit of liability for bodily and personal injuries was $500,000. In contrast to the PO & E policy, the CGL policy specifically covers damages arising from "occurrences" of bodily injury and personal injury. A bodily injury "occurrence" arises from an accident, and it includes bodily injuries stemming from "continuous or repeated exposure to substantially the same general conditions." However, under policy Exclusion f, bodily injuries that are expected or intended by the insured are not covered "occurrences." A personal injury "occurrence" includes the "written publication of material that violates a person's right to privacy." However, the policy would not cover such an "occurrence" if the damages arise from a publication that violated someone's right to privacy before the beginning of the policy period. The policy has other exclusions as well.[4]
 
 
 8
 Under the policy's broad net of coverage, an "insured" includes not only the Board of Commissioners, who are the "named insured," but also any commission, board, authority, administrative department or other similar unit operated by or under the jurisdiction of the named insured. It also includes as "insureds" any employees and authorized volunteers who work for those insureds. Ibid. However, it does not cover claims by such employees for bodily injury or personal injury to co-employees while in the course of their employment or while acting on behalf of the insured.
 
 
 9
 The Board considered various defensive litigation strategies regarding the lawsuit filed by the Propers, and it looked to its CGL policy, invoking the carrier's duty to defend. Twin City, citing a broad interplay of exclusions, refused the Board's request for coverage. Among Twin City's reasons for denying coverage, it contended that the sheriff and his department were sufficiently linked to the "named insured" Board so as to be considered as "insured," too. Since the sheriff had consciously harassed Ms. Proper, this "insured's" intentional actions were excluded under Exclusion f. Moreover, such deliberate injuries were not bodily injury "occurrences," as the term is defined in the policy. Furthermore, the injuries, sustained by an employee of an "insured," arose from and during the course of Ms. Proper's employment by an "insured." Twin City also questioned whether the injury suffered in sexual harassment can be described as a "bodily" injury.
 
 
 10
 Despite its insurance problem with Twin City, the Board felt compelled to act before the suit came up for trial. Based on its evaluation of the options available, the Board entered into a negotiated settlement with the Propers on June 24, 1991, agreeing to pay $100,000 for a comprehensive release and settlement of all claims concerning all defendants. In the course of defending itself and negotiating the compromise, the Board also incurred $30,325.78 in legal fees and costs. Consequently, the Board next turned to its PO & E carrier for indemnification. However, ISLIC, citing its policy exclusions, also denied the Board's request for coverage. ISLIC contended that the predominant source of damages claimed by the Propers stemmed from the bodily and personal injuries sustained by Ms. Proper, which are excluded under Exclusion 5(a).[5]
 
 
 11
 On March 10, 1992, the Board filed a complaint against the two carriers in federal court, charging that the defendants had breached their contractual obligations and had acted in bad faith by failing to provide policy coverage for the damages and expenses incurred by the Board in resolving the Propers' lawsuit. The Board alleged that Twin City had breached its contractual duties to defend and to cover injuries sustained by Proper, and that ISLIC had breached its duty to indemnify the Board for its legal expenses. On September 3, Twin City moved for summary judgment, and ISLIC followed with its own summary judgment motion four weeks later. The carriers cited exclusion clauses within their respective policies, interpreting them to justify denying the Board's claims for coverage.
 
 
 12
 The district court granted summary judgment to both ISLIC and Twin City. As to ISLIC, the court found that: (1) the Board's claims for coverage were voided by express policy exclusions that deny coverage for claims stemming from pending legal problems known by the insured to be pending at the time of application or renewal, but not disclosed to the insurer; (2) remedial damages related to bodily and personal injury, such as medical expenses and lost future wages for those kinds of claims, were not covered by the terms of the PO & E policy; and (3) the insurer's partial contribution had indeed met the requirements of an accord and satisfaction under Ohio law.
 
 
 13
 With regard to Twin City, the court found that: (1) the Board would not have been legally liable to the Propers because the Propers' stated injuries had been caused by the sheriff; therefore the Board's payments were those of a "volunteer"; (2) the "bodily injuries" claimed by the Board were excluded from coverage because they were not the results of "occurrences," as the term was defined in the policy; (3) the Board had no basis for claiming indemnification for payments of "personal injury damages" because the Propers' complaint never alleged "personal injury damages"; and (4) Twin City had no duty to defend the Board against the Propers' lawsuit, which had frivolously named it a defendant. The Board appealed on April 13, 1993, from the summary judgment decisions.
 
 II
 
 14
 The Board's action against Twin City claimed that the carrier had failed to honor its duty to cover scheduled injuries and its duty to defend. However, we agree with the district court that coverage for the claimed injuries had been excluded under provisions of the policy, and that Ohio common law absolved Twin City from a duty to defend under the circumstances in this case.
 
 
 15
 * Twin City contends that the sheriff was an "insured" under the CGL policy. Therefore, the policy could not have covered Ms. Proper's "bodily injury" claims because those alleged injuries had resulted while she was employed by an "insured," and they arose "out of or in the course of employment by any insured." See supra note 4 (discussing Exclusions g and i ). Furthermore, the alleged injuries arose from the sheriff's intentional acts, bringing them under Exclusion f of the policy, also.[6]
 
 
 16
 The Board responds that the sheriff was not an "insured" under the CGL policy because he is separately and independently elected by the public, and he does not operate under the Board's control. Consequently, even if he acted intentionally, his actions do not come within Exclusion f because his acts were not "expected or intended from the standpoint of the insured."[7] (Emphasis added.) Second, the Board maintains, Ms. Proper's "bodily injuries" should be deemed to have resulted from an "occurrence" because the harasser intended at most psychological harassment but not bodily injury to Ms. Proper. Third, Ms. Proper's injuries may be deemed "bodily," even though caused by psychological stress, because the distress that she suffered did in fact necessitate her hospitalization for four days at Wooster Community Hospital, where she was treated for real physical symptoms, including abdominal pain, acute gastritis, and nausea.
 
 
 17
 We review a grant of summary judgment de novo. EEOC v. University of Detroit 904 F.2d 331, 334 (6th Cir.1990). In this case, our review of the record indicates that, even if the Holmes County sheriff does operate with a measure of political independence from the Board, the Board still felt compelled to intervene to settle the Propers' lawsuit before trial because any adverse judgment against the Sheriff's Department would have been payable from Holmes County's general treasury, which the Board administers. Therefore, the Board cannot now plausibly argue that, while it controls the purse-strings of the county, including the expenditure and allocation of funds to the Sheriff's Department, as well as the payment of fines and penalties imposed against that department, it has no authority whatsoever over a completely separate and "independent" Sheriff's Department. Rather, we hold that the political and budgetary links between the Board and the Sheriff's Department are sufficient to bring the Sheriff's Department "under the jurisdiction" of the Board, at least for purposes of insurance coverage, and thus to make the sheriff an "insured" party under the CGL policy. Thus, under Exclusion f, the carrier could deny coverage for any damages that arose from the bodily injury and personal injury that Proper allegedly suffered from the sheriff's acts of harassment and retaliatory employment discrimination because those acts were "expected or intended from the standpoint of the insured."[8]
 
 B
 
 18
 After determining that Twin City did not have a duty to indemnify the Board for the injuries that Proper allegedly sustained, the district court addressed whether the insurer nevertheless had a duty to defend the Board when it had been named as a co-defendant in the Propers' action. The court reviewed the development of Ohio common law with regard to an insurer's duty to defend under a liability policy.
 
 
 19
 In Motorists Mutual Insurance Co. v. Trainor, 33 Ohio St.2d 41, 41, 294 N.E.2d 874, 875 (1973), the Ohio Supreme Court held that, where a plaintiff files a complaint, stating claims for injuries that are within the insured's policy coverage, the insurer was "required to make defense, regardless of the ultimate outcome of the action or its liability to the insured."
 
 
 20
 A decade later, the Ohio Supreme Court seemed to expand the insurer's duty to defend, even when a complaint does not directly implicate a provision expressly covered in a defendant-insured's liability insurance policy. If "the allegations do state a claim which is potentially or arguably within the policy coverage, or [even if] there is some doubt as to whether a theory of recovery within the policy coverage ha[s] been pleaded, the insurer must [still] accept the defense of the claim." City of Willoughby Hills v. Cincinnati Ins. Co., 9 Ohio St.3d 177, 180, 459 N.E.2d 555, 558 (1984).
 
 
 21
 Despite the expansive tone of the Willoughby Hills opinion, however, the district court in this case noted that the Ohio courts have interpreted it narrowly, limiting Willoughby Hills to its unique facts, in which an insurance policy contained an explicit provision that "even if any of the allegations of the suit are groundless, false or fraudulent," the insurer would bear a duty to defend. Id. at 177, 459 N.E.2d at 556.
 
 
 22
 Thus, the Ohio Court of Appeals held five years later that Willoughby Hills does not require a liability insurer to defend its insured when a plaintiff brings claims that are groundless, false, or fraudulent, as long as the insurer has not explicitly assumed the extra burden to do so as did the insurer in Willoughby Hills. Weaver v. Motorists Mut. Ins. Co., 62 Ohio App.3d 836, 839, 577 N.E.2d 703, 705 (1989). Citing a state supreme court case that appeared after Willoughby Hills, the Weaver court noted that the state supreme court had limited its Willoughby Hills rule so that "an insurer's duty to defend does not depend solely on the allegations of the underlying tort complaint." Preferred Risk Ins. Co. v. Gill, 30 Ohio St.3d 108, 114, 507 N.E.2d 1118, 1124 (1987). Therefore, if the insurer has not expressly undertaken an expanded duty to defend even against charges that can be characterized as groundless, false, or fraudulent, it need not so defend.
 
 
 23
 We agree with the district court that Preferred Risk narrowed the interpretive sweep of Willoughby Hills in Ohio. In this case, the district court held that Twin City was not obligated to defend the Board because, while the charges against the sheriff may have been valid, nevertheless the charges against the Board were groundless, false, or fraudulent. Since Twin City had not inserted any clauses into its CGL policy with the Board that had expressly committed itself to defend against such baseless charges, it was not obligated to defend the Board.
 
 III
 
 24
 Under section 10(c) of its PO & E policy, the Board agreed in August 1990, at the time that it applied for its one-year policy renewal, that:
 
 
 25
 [n]o fact, circumstance or situation indicating the probability of a claim or action is now known to any Public Official or Employee; and it is agreed by all concerned that if there be knowledge of any such fact, circumstance, or situation, any claim or action subsequently emanating therefrom shall be excluded from coverage under the insurance here being applied for.
 
 
 26
 JA at 238 (emphasis added). Despite its agreement to this exclusion, the Board failed to notify ISLIC at the time that the policy was being renewed that "troubles were brewing" in the Sheriff's Department, where a public employee had already filed two complaints with federal and state civil rights agencies over sexual harassment and sex discrimination. There is no suggestion that the Board consciously withheld information from ISLIC. Rather, it is mutually agreed that the failure to disclose resulted from Commissioner Bell's innocent ignorance of the emerging problem. Nevertheless, the sheriff is a "public official" in Holmes County, and that public official knew very well, at the time that the Board applied for renewal of the PO & E policy, that a claim or action was probable. Consequently, the district court correctly found that section 10(c) of the policy excluded from coverage all claims for indemnification that "emanat[e]" from the Propers' action.
 
 IV
 
 27
 For the foregoing reasons, the decisions of the district court, granting summary judgment to both Twin City and to ISLIC, are AFFIRMED.
 
 
 
 [1]
 The action claimed that Ms. Proper had been subjected to sexual harassment, sex discrimination, and unlawful employment retaliation, in violation of her First Amendment rights and in violation of 42 U.S.C. Sec. 1983 (deprivation of rights by a public official acting under color of law) and id. Secs. 2000e through 2000e-16 (Title VII of the Civil Rights Act of 1964). The Propers also claimed damages under Ohio law for breach of contract, intentional infliction of emotional distress, and for unlawful employment discrimination and retaliation in violation of Ohio Rev.Code ch. 4112
 
 
 [2]
 Commissioner Bell seems to have disclosed fully to ISLIC all information that he knew. The EEOC and OCRC issued Proper a right-to-sue letter on September 28, 1990. On November 2, 1990, shortly after the Proper lawsuit was filed, the Board formally informed ISLIC of that development. ISLIC then conducted an investigation of the underlying circumstances
 
 
 [3]
 A PO & E policy is somewhat like a "D & O policy" that covers corporate directors and officers from liability for actions and decisions they take in conducting corporate affairs. It is therefore distinguishable from a general liability policy, which would cover the more traditional risks associated with bodily injury, personal injury, disease, and death
 
 
 [4]
 Thus, in contrast to a workers' compensation policy, "Exclusion g" denies coverage for damages arising from a bodily injury, personal injury, or employee benefits injury sustained "as the result of an occurrence directly or indirectly relating to the employment ... of any person by the insured." (Emphasis added.) Similarly, "Exclusion i " excludes coverage for bodily injuries sustained by "[a]n employee of the insured arising out of or in the course of employment by any insured." (Emphasis added.)
 
 
 [5]
 The Board thus found that, under the PO & E policy, it could not be indemnified because the Propers had alleged bodily and personal injuries, two forms of injury that the policy specifically excluded. Yet, the Board also found that, under its CGL coverage for bodily and personal injury claims, Twin City would not honor the request for coverage partly because that carrier questioned whether the injuries allegedly sustained by Ms. Proper as a result of the sexual harassment could be legally defined as "bodily" and "personal" injuries
 Ultimately, ISLIC consented to pay $36,822.29, a sum covering half of Proper's total attorney's fees and all of her claimed back wages, but stressed that it would not cover claims for Ms. Proper's lost future wages because those damages stemmed from excluded bodily and personal injuries.
 
 
 [6]
 See supra at 6. Twin City raises other defenses, but we need not consider them here because we hold that Exclusion of sufficiently excuses the carrier from providing coverage for the Board's claims
 7See supra at 6. The Board further notes that the sheriff and Sheriff's Department have their own, separate CGL insurance policies, further indicating that the independent, separately elected sheriff was never intended by the Board to be an "insured" on its Twin City policy.
 
 
 [8]
 Because we hold that the Board's CGL coverage could be denied under Exclusion f, we need not discuss other exclusion theories under which that coverage could have been denied